IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LEROY KEMP,<br><br>          Plaintiff,<br><br>vs.<br><br>DR. SISAR PADERES, NURSE NEAL HAYASE, NURSE CORRINA HO, ACO SCOTT KOWOLESKI, and ACO MELVIN MOISSA,<br><br>          Defendants. | CIVIL NO. 03-00419 SOM-KSC<br><br>MEMORANDUM IN SUPPORT OF MOTION |

MEMORANDUM IN SUPPORT OF MOTION

I.    INTRODUCTION

Plaintiff, a State of Hawaii prisoner, claims that the medical treatment he received at Halawa Correctional Facility ("HCF") constituted deliberate indifference and cruel and unusual punishment in violation of his rights under the Eighth Amendment. Plaintiff seeks special, general and punitive damages from Defendant Dr. Sisar Paderes ("Dr. Paderes").[1]

---

[1] All claims against Defendants Neil Hayase, Scott Kowalewski and Corrina Buan were dismissed pursuant to the Court's Order Granting Rule 12 (c) Motion for Judgment on the Pleadings based upon qualified immunity, filed March 6, 2006 ("Order"). Defendant Melvin Moissa has never been served and the only remaining claims remaining for adjudication are against Dr. Sisar Paderes. See Order at page 12.

173826_1.DOC

For the reasons and authorities set out below, Defendant Dr. Paderes moves this Court for an order granting summary judgment on all claims in his favor and against Plaintiff.

II.    FACTS

Plaintiff claims that Dr. Leah Ridge, a neurologist, prescribed the anti-convulsant Lamictal to control Plaintiff's seizures, but Dr. Paderes refused to provide it to him until after April 6, 2003.  (See Amended Complaint filed August 14, 2004 ("Am. Compl.") ¶ 13).  Plaintiff claims that he had various seizures as a result of being denied Lamictal.  In addition, Plaintiff claims that Dr. Paderes wrongfully denied him of an operation to his knee for a year and a half.  Id. at ¶ 27.

Dr. Paderes has been employed by the Department of Public Safety as a Physician, Level Two, at HCF since December of 1996.  (See Declaration of Dr. Sisar Paderes ("Dr. Paderes Decl."), attached as Exhibit 1 to his Separate and Concise Statement of Facts, ¶ 1).  Previously he worked for the Department of Health at Waimano Training School and Hospital.  Id. at ¶ 3.  During the course of that employment from 1985 until 1996, he took care of patients that had various seizures, including grand mal seizures, because of their brain abnormalities or illnesses.  Id.  He has also attended seminars and reviewed literature distributed by various medical associations concerning treatment of those suffering from seizure disorders.  Id. at ¶ 4.

Dr. Paderes, and others, have treated Plaintiff for his alleged "seizure disorder" and for his left knee injury. Id. at ¶ 5.

Plaintiff's Medical History

    A.    Seizures v. Psuedoseizures

Plaintiff claims to have had "seizures" since 1997. (See Declaration of Christine E. Savage ("Savage Decl."), attached as Exhibit 1 to Defendant's Separate and Concise Statement of Facts, at Exh. "A" ¶ 1). He had head trauma secondary to a fall in 1995, as well as previous head traumas during his younger years. Id. He initially was placed on Dilantin at the Queen Emma Outpatient Clinic. Id. On August 27, 2001, Plaintiff was transferred from OCCC to HCF. (See Dr. Paderes Decl. ¶ 6 and Exh. "A" at HCF00298). At that time, Plaintiff was taking anti-convulsants, Dilantin and Phenobarbital, for his "seizure disorder." Id.

On October 15, 2001, the Plaintiff was admitted to Pali Momi for an "apparent seizure." (See Dr. Paderes Decl. ¶ 7 and Exh. "A" at HCF00359-60). Dr. Leah Ridge, a neurologist at Pali Momi, was consulted regarding Plaintiff's seizure disorder. Id. Based on her examination of the Plaintiff and review of his diagnostic tests, including an EEG, she diagnosed the Plaintiff as having pseudoseizures.[2] Id.

---

[2] Pseudoseizures (psychogenic seizures) are nonepileptic behaviors that resemble seizures. They are often part of a conversion reaction precipitated by underlying psychological distress. (See Paderes Decl. at ¶ 7).

Although the Plaintiff thought Phenobarbital controlled his seizures well, Dr. Ridge felt it wasn't a good anti-convulsant, because of its long-term memory loss affects. Id. She recommended the use of Lamictal in place of Phenobarbital, because of its fewer side affects. Id. Plaintiff was discharged back to HCF on October 16, 2001. Id.

Dr. Paderes received a copy of Dr. Ridge's consultation on October 22, 2001, and discussed with her the recommendation to substitute Lamictal for Phenobarbital. (See Dr. Paderes Decl. ¶ 8 and Exh. "A" at HCF00272). Dr. Paderes informed Dr. Ridge that Lamictal was not on HCF's formulary, a list of pre-approved medications for various illnesses, and that it would be difficult to obtain. Id. After reviewing his medical reference, Dr. Paderes asked Dr. Ridge if it would be okay to use Tegretal, an anti-convulsant on the formulary, instead of Lamictal. Id. Dr. Ridge agreed that Tegretal would be fine. Id.

On October 22, 2001, Dr. Paderes discharged the Plaintiff from HCF Medical Infirmary. (See Paderes Decl. at ¶ 9 and Exh. "A" at HCF00272). During the discharge process, Dr. Paderes informed Plaintiff of his conversation with Dr. Ridge, and that she said if was okay to substitute the Tegretal for the Lamictal she originally recommended. Id. The Plaintiff said he understood and agreed to the change. Id.

Plaintiff was sent to Dr. Ridge on January 15, 2003, for a follow-up to an Emergency room visit for a "seizure." (See Dr. Paderes Decl. ¶ 10 and Exh. "A" at HCF00605). On March 19, 2003, Dr. Ridge suggested adding Lamictal to medications. Id. Dr. Paderes agreed to follow her recommendation. Id. at ¶ 10 and HCF00605.

On March 24, 2003, Plaintiff was seen in the Chronic Care Clinic at HCF. Id. at ¶ 10 and Exh. "A" at HCF00550-51. This clinic is held for patients who have on-going medical conditions that need to be monitored. Id. at ¶ 10. By then, Plaintiff was receiving Phenobarbital (90 mg), Tegretol (300 mg), and Lamictal (150 mg) pursuant to Dr. Ridge's March 19, 2003, recommendation. Id. at ¶ 10 and Exh. "A" at HCF00550-51.

On April 6, 2003, Plaintiff was admitted to Pali Momi for an alleged seizure, and was seen by Dr. Ridge, who recommended a change of medication to Lamictal (200 mg) and Tegretol (500 mg). (See Dr. Paderes Decl. at ¶ 11 and Exh. "A" at HCF00602). As a result, Plaintiff's medications were changed accordingly. Id.

On May 7, 2003, and September 22, 2003, Dr. Paderes referred Plaintiff to Dr. Ridge for follow up only. (See Dr. Paderes Decl. at ¶ 12 and Exh. "A" at HCF00588 and 905). In addition, Plaintiff was seen again the Chronic Care Clinic on January 4, 2004, for his seizure disorder. Id. at ¶ 12 and Exh. "A" at HCF00842-3.

Despite the medication changes, Plaintiff was admitted to the HCF infirmary on 4/26/03 – 4/29/03, 7/31/03, 11/8/04 – 1/12/05, 4/18/05 – 4/22/05 and 2/15/06 for "pseudoseizures." Id. at ¶ 13 and Exh. "A" at HCF00837-839.

In addition to the above-listed dates, Plaintiff was admitted and kept in the infirmary at HCF for constant observation during the following periods:  2/9/02– 2/19/02, 3/29/02–3/30/02, 4/1/02–4/2/02, 5/26/02–5/27/02, 6/26/02–6/28/02, 8/27/02, 11/1/02–11/8/02, 12/11/02–12/12/02, and 1/15/03–1/23/03.  Id. at ¶ 14.

Dr. Paderes' did not work at HCF Medical Unit from On July 13, 2004, until recently due to his deployment to Iraq. Id. at ¶ 15.  However, subsequent referrals to specialists (Dr. Drazin and Dr. Stein) have confirmed that Plaintiff suffers from pseudoseizures, and thus, any use of anticonvulsants, either Lamictal or Tegretal, becomes irrelevant. Id. at ¶ 16.

On September 15, 2004, Thomas A. Drazin, M.D., a neurologist, performed an Independent Medical Examination on Plaintiff.  (See Savage Decl. at Exh. "A").  Dr. Drazin diagnosed Plaintiff as having pseudoseizures with the remote possibility of an underlying seizure disorder.  Id.

As to the issue of Plaintiff's medications, Dr. Drazin concluded that if Plaintiff was suffering from a seizure disorder, the medications prescribed were reasonable and appropriate.  Id.  In fact, in light of his diagnosis that the Plaintiff was suffering from psuedoseizures, the Plaintiff was actually over-treated, because

there are "**no clear medications that would be appropriate for true pseudoseizures**." Id.

In addition, Dr. Drazin concluded that the treatment of Plaintiff's "seizures" was reasonable and appropriate. Id. Because the Facility had treated most of Plaintiff's episodes as if they were real seizures, it is his opinion that Plaintiff may have been over-treated pharmacologically. Id.

Dr. Drazin was subsequently provided with an "extensive videotape" of Plaintiff having an alleged "seizure" at the Facility. (See Savage Decl. at Exh. "B"). Dr. Drazin reviewed the videotape, and concluded that after viewing the video, the type of seizures Plaintiff was experiencing were clearly pseudoseizures. Id. Therefore, it was "unnecessary for him to have an inpatient EEG as the diagnosis is clearly made from the videotape." Id.

In an abundance of caution, Plaintiff was referred to Dr. Alan G. Stein, M.D., an epilepsy specialist at the Queen's Medical Center, for video electroencephalogram monitoring to determine whether Plaintiff's seizure-like spells were epileptic or nonepileptic. (See Paderes Decl. Exh.'s "B" and "C"). Plaintiff's medications were tapered and within two days were discontinued altogether. Id. Provocative maneuvers such as sleep deprivation were employed. Id. Plaintiff had a single seizure-like episode on April 13, 2005. Id. Behaviorally, this incident was extremely similar to the behavior that was viewed on the

videotape.  Id.  There were no epileptiform discharges, ictal discharges or other

findings to suggest an epilepti seizure basis for the event.  Id.  In addition,

throughout Plaintiff's entire stay, his electroencephalogram was free of any

epileptiform activity.  Id.  Dr. Stein's **"recommendation for seizure management

is that he be on no anticonvulsant whatsoever."**  Id.  He opined that the events

are noneptileptic (psychogenic) in nature.  Id.  Therefore, if Plaintiff does have

anymore of these events, his head should be cushioned with a pillow and his body

otherwise protected from injury, but other than that, no intervention be made as

they are semi-voluntary in nature and will cease on their own.  Id.

    B.    Knee Injury

Plaintiff's medical records show that he has a history of knee problems

dating back to 1993. (See Savage Decl. at Exh. "C" at QMC 027, and 057; Dr.

Paderes Decl. ¶ 17 and Exh. "A" at HCF00172, HCF00159, HCF00157,

HCF00155, HCF00216-9, HCF00237 (Bates Stamp on top left corner), and

HCF00535.

On October 11, 2002, Dr. Paderes referred Plaintiff to Dr. Terry Vernoy, an

Orthopedic Surgeon, for a consult.  (See Paderes Decl. ¶ 18 and Exh. "A" at

HCF00606).  Dr. Vernoy is a community orthopedic surgeon who has performed

several knee surgeries for HCF inmates.  Id.  Until recently Plaintiff's main concern

was directed toward his "seizures."  Id.  Plaintiff now claims that he had increased

pain and deformity to his left knee. Id. Thus, Dr. Paderes felt a consultation was appropriate. Id.

Dr. Vernoy reported that Plaintiff was seen for what patient states is a deformed left knee since May of 2002. Id. at ¶ 19 and Exh. "A" at HCF00606-7. He stated he was held down during his seizure to prevent him from hurting himself and he experienced increased pain and instability to his left knee. Id. **He denies previous history of knee injury.** Id.

Recent X-rays of the left knee show an obvious varus deformity to the left knee joint of questionable etiology, most likely secondary to old fracture of the medial compartment tibial plateau. Id. at ¶ 20 and Exh. "A" at HCF00606-7. There are also osteoarthritic changes of the intercondylar notch and patellofemoral area and an old lateral capsular sign consistent with previous anterior cruciate ligament and possible lateral collateral ligament injuries. Id.

Dr. Vernoy's medical conclusions after examining the Plaintiff and reviewing his medical records were: 1) old left knee varus deformity of questionable etiology, most likely secondary to old medial tibial plateau fracture, 2) Osteoarthritus of the left knee tricompartments with old anterior cruciate ligament and possible lateral collateral ligament injuries with positive lateral capsular signs, and 3) increased left knee instability per the patient with minimal objective instability on this exam. Id. at ¶ 21 and Exh. "A" at HCF00606-7.

Basically, Dr. Vernoy is questioning what Plaintiff is telling him when he refers to "questionable etiology. (See Dr. Paderes Decl. at ¶ 22). The damage is most likely secondary to "old" fracture. Id. In addition, although Plaintiff reports increasing left knee instability, the objective findings based on his examination, shows "minimal objective instability." Id. In other words, his knee was not as unstable as the patient reported. Id.

Dr. Paderes and the other corrections doctors, after reviewing Dr. Vernoy's report, decided to continue with conservative treatment that included use of a knee brace, physical therapy, and medications without resorting to surgery. (See Dr. Paderes Decl. at ¶ 23). Surgery is often done to restore function and relieve pain. Id. However, in this situation Plaintiff was able to continue with his daily activities and even work. Id. In addition, surgery is not always successful and surgery is often looked at as a last resort in trying to achieve functionality and relieve pain. Id. There are also the complications, such as infections, loss of the leg, severe allergic reactions, and loss of function. Id. Finally if surgery was done early, the Plaintiff might have to undergo knee surgery in 10 to 20 years. Id. Due to his advance age he may not be able to tolerate the same procedure again. Id.

On March 24, 2003, Dr. Paderes requested a re-evaluation of Plaintiff's left knee with Dr. Vernoy. Id. at ¶ 24 and Exh. "A" at HCF00586. During Plaintiff's follow-up visit on May 5, 2003, Dr. Vernoy noted no changes in Plaintiff's repeat

10

X-rays. Id. at ¶ 24 and HCF00586-7. He recommended that Plaintiff continue with conservative therapy, but if surgery was necessary then he recommended a referral to Dr. Calvin Oishi, an orthopedic surgeon who does knee replacement surgery. Id.

In May of 2003, the Special Utilization Review Panel ("SURP"), comprised of Dr. Paderes, Dr. Saldana, and Dr. Bauman, discussed whether or not surgery was needed. Id. at ¶ 25 and Exh. "A" at HCF00585 and 587. The Panel decided that surgical intervention was not needed at this time, because Plaintiff was ambulatory and functioning independently while on conservative therapy. Id.

In July of 2003, SURP again decided not to refer Plaintiff for a surgery consultation due to Plaintiff's ability to work in the work line, weight bear with a brace and, because it was an early age for total knee replacement. Id. at ¶ 26 and Exh. "A" at HCF00584. SURP decided to re-evaluate clinically as needed. Id.

In November of 2003, Plaintiff claims he was walking down mainstreet and his knee gave way. (See Paderes Decl. at ¶ 27 and Exh. "A" at HCF00926). On exam, the Plaintiff had facial grimacing, was unable to move his knee, groaning, and appeared to be in severe pain. Id. However, no swelling or ecchymosiss (bruising) was observed. Id. Physical therapy and medication were prescribed, and total knee replacement was denied by the SURP committee. Id.

11

In December of 2003, SURP discussed the necessity of a total left knee replacement, and decided against surgical intervention, but to continue conservative treatment. Id. at ¶ 28 and Exh. "A" at HCF00828.

On January 20, 2004, Dr. Abbruzzese requested that SURP reassess new finding of fluid like soft pulp area to patients left knee. Id. at ¶ 29 and Exh. "A" at HCF00823. Plaintiff was also having increased pain and stiffness to the left knee. Id. The next day, Dr. Abruzzesse discussed his findings with members of the SURP, including Dr. Paderes, and they agreed to go ahead with the total knee replacement by Dr. Oishi. Id.

On March 4, 2004, Plaintiff underwent a left total knee arthroplasty with lateral release. (See Savage Decl. at Exh. "D" at KMC 201-203). Plaintiff was discharged with a diagnosis of severe osteoarthritis of the left knee. Id.

III.  STANDARD OF REVIEW

One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses, thereby avoiding unnecessary trials. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986); Northwest Motorcycle Ass'n v. USDA, 18 F.3d 1468, 1471-72 (9th Cir. 1994) (citing Zweig v. Hearst Corp., 521 F.2d 1129 (9th Cir. 1975), cert. denied, 423 U.S. 1025 (1975)). Thus, summary judgment is granted where, viewing the evidence and the inferences arising therefrom in favor of the nonmoving party, there are no genuine issues of

material fact and the moving party is entitled to a judgment as a matter of law.

FRCP Rule 56(c); Bator v. State of Hawaii, 39 F.3d 1021, 1025-26 (9th Cir. 1994).

The plain language of Rule 56(c) mandates the entry of summary judgment against

a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, on which that party will bear the burden of

proof at trial.  Celotex, 477 U.S. at 322.

> If the party moving for summary judgment meets its initial
> burden of identifying for the court the portions of the
> materials on file that it believes demonstrate the absence
> of any genuine issue of material fact, the nonmoving party
> may not rely on the mere allegations in the pleadings in
> order to preclude summary judgment.

T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th

Cir. 1987) (citations omitted).  FRCP Rule 56(e) requires the nonmoving party to

set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing

that there is a genuine issue for trial."  (emphasis added); Bator, 39 F.3d at 1026.

The nonmoving party must produce at least some "`significant probative evidence

tending to support the complaint'." T.W. Elec., 809 F.2d at 630 (quoting First Nat'l

Bank v. Cities Serv. Co., 391 U.S. 253, 290 (1968)); Barnett v. Centoni, 31 F.3d

813, 815 (9th Cir. 1994) (citations omitted).  Legal memoranda and oral argument

are not evidence and do not create issues of fact capable of defeating an otherwise

valid motion for summary judgment.  British Airways Bd. v. Boeing Co., 585 F.2d

946, 952 (9th Cir. 1978), cert. denied, 440 U.S. 981 (1979); Legal Aid Society of

Hawaii v. Legal Services Corp., 981 F. Supp. 1288, 1291 (D. Haw. 1997).

The Ninth Circuit has established that "[n]o longer can it be argued that any

disagreement about a material issue of fact precludes the use of summary

judgment." California Architectural Bldg. Products, Inc. v. Franciscan Ceramics,

Inc., 818 F.2d 1466, 1468 (9th Cir. 1987), cert. denied, 484 U.S. 1006 (1988);

Legal Aid Society, 981 F. Supp. at 1291.  Moreover, "[w]hen the moving party has

carried its burden under Rule 56(c), its opponent must do more than simply show

that there is some metaphysical doubt as to the material facts." Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citations

omitted).  Indeed, "if the factual context makes the non-moving party's claim

implausible, that party must come forward with more persuasive evidence than

would otherwise be necessary to show that there is a genuine issue for trial."

California Architectural, 818 F.2d at 1468 (emphasis in original) (citing

Matsushita, 475 U.S. at 587); see U.S. ex rel. Anderson v. Northern Telecom, Inc.,

52 F.3d 810, 815 (9th Cir. 1995).

IV.    ARGUMENT

     A.    Defendant Dr. Paderes, In His Official Capacity, Is Immune From
          Suit Under The Eleventh Amendment To The United States
          Constitution

The Eleventh Amendment bars Plaintiff's claims against Defendant Dr. Paderes in his official capacity. The "eleventh amendment bars citizen suits against states, institutional arms of the state, and state officials in their official capacity when the relief sought is retrospective in nature; i.e., damages."[3] Ulaleo v. Paty, 902 F.2d 1395, 1398 (9th Cir. 1990) (citing Green v. Mansour, 474 U.S. 64, 68 (1985). "A suit against an official in his official capacity is a suit against the official's office and not against the official. As such, it is a suit against the state." Bator v. State of Hawaii, 910 F.Supp. 479, 484 (D. Haw. 1995). Unless a state unequivocally waives sovereign immunity or Congress has acted to override that immunity, the state, its agencies, and its officials are immune from suit. Will v. Michigan Dept. of State Police, 491 U.S. 58, 66 (1989). See also Kentucky v. Graham, 473 U.S. 159, 165-67 (1978) (suit for damages against a state officer in official capacity is barred by the Eleventh Amendment).

Defendant Dr. Paderes has been sued in his official capacity. See Am. Compl. ¶¶ 5-7. Plaintiff seeks retrospective relief in the form of monetary damages. See Am. Compl. at ¶ 29. The State of Hawaii has not "unequivocally" waived its immunity from suit for retrospective relief, and Congress has not

_____

[3] The Eleventh Amendment to the United States Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State.

overridden the immunity. Therefore, under the protection afforded them under the Eleventh Amendment, Defendant Dr. Paderes is immune from suit, and all federal claims against him, in his official capacity, must be dismissed.

> B.    Defendants Dr. Paderes, In His Official Capacity, Is Not A "Person" Within The Meaning Of 42 U.S.C. § 1983

Plaintiff's claims against Defendant Dr. Paderes, in his official capacity, are also barred under 42 U.S.C. § 1983. Section 1983 provides that any "person" acting under the color of state law in violating another's rights is liable to that injured party. However, "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." Will v. Michigan Dept. of Police, 491 U.S. at 71; Doe v. Lawrence Livermore Nat'l Lab, 131 F.3d 836, 839 (9th Cir. 1997). "Obviously, state officials are literally persons. But a suit against a state official in her or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." Will, 491 U.S. at 71 (citations omitted).

Official capacity defendants cannot be sued under Section 1983, in either state[4] or federal court. Accordingly, Plaintiff's Section 1983 claims against

_____

[4] Plaintiff cannot maintain a 42 U.S.C. § 1983 claim in state court against the state because it "has not waived its sovereign immunity from § 1983 damages liability." Makanui v. Department of Education, 6 Haw.App. 397, 406, 721 P.2d 165, 171 (1986).

Defendant Dr. Paderes, in his official capacity, fail to state a claim upon which relief can be granted, and must be dismissed.

C.     Dr. Paderes Was Not Deliberately Indifferent To Plaintiff's Medical Needs

The Eighth Amendment imposes an obligation on prison officials to provide for the basic human needs of prisoners. Farmer v. Brennan, 511 U.S. 825, 832 (1994). This obligation includes providing prisoners access to adequate medical care. Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994). A prisoner states a cause of action under 42 U.S.C. § 1983, if he demonstrates that he had a serious medical need and prison officials were deliberately indifferent to it. Id.

A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical needs and the nature of the defendant's response to that need. McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

" A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.' " McGuckin, 974 F.2d at 1059 (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976). "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence

of chronic pain and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." Id. at 1059-60 (citations omitted).

Furthermore, two minimum requirements must be satisfied in order to establish deliberate indifference: (1) there must be a purposeful act or failure to act on the part of the defendant, and (2) the defendant's denial must have been harmful. McGuckin, 974 F.2d at 1060. "A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established." Id. An accident or inadvertent failure to provide adequate medical care does not create a cause of action under Section 1983. Id.

The United States Supreme Court has held that deliberate indifference to a prisoner's serious illness or injury states a cause of action under 42 U.S.C. § 1983. Estelle v. Gamble, 429 U.S. 97, 105 (1976). However, in order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. Id. at 106. In Estelle, an inmate injured his back while unloading bales of cotton from a truck. Dissatisfied with the medical treatment he received, the inmate filed suit under 42 U.S.C. § 1983 claiming that prison officials had subjected him to cruel and unusual punishment in violation of the Eighth Amendment. Affirming the district court's dismissal of the claims against the prison's medical director, the Court found that the inmate was seen and treated by medical personnel a total of seventeen times

18

over the course of three months.  The Court held that the propriety of additional diagnostic techniques, such as an x-ray, or additional forms of treatment, was "a classic example of a matter for medical judgment", and that "[a] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment."  Id. at 107.

The Court explicitly held in Estelle that not every claim by a prisoner that he or she has received inadequate medical treatment states a violation of the Eighth Amendment.  Inadvertent failure to provide adequate medical care, specifically, a complaint that a physician has been negligent in diagnosing or treating a medical condition, does not state a valid claim of medical mistreatment under the Eighth Amendment:  "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  Id. at 105-06.

The Ninth Circuit has adopted this rationale in a series of cases since Estelle: Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990) ("we scrutinize the particular facts and look for substantial indifference in the individual case, indicating more than mere negligence or isolated occurrences of neglect"); Hutchinson v. U. S., 838 F.2d 390, 394 (9th Cir. 1988) ("mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights"); Franklin v. State of Oregon, State Welfare Div., 662 F.2d 1337, 1344 (9th Cir. 1981) ("A difference of opinion between

prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim").

For there to be deliberate indifference, the defendant must "purposefully ignore or fail to respond" to a prisoner's pain or possible medical need; an accident or inadvertent failure to provide care is insufficient. McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997). Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).

Moreover, liability under 42 U.S.C. § 1983 arises only upon a showing of the defendant's personal participation in the deprivations complained of. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). The defendant must have engaged in an affirmative act, participated in another's affirmative act or omitted to perform an act that he was legally required to do that caused the deprivation. Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988). The inquiry into causation must be individualized and focus on the duties and responsibilities of each defendant. Id. "Each individual defendant can be liable only for what he or she did personally, not "for any recklessness on the part of any other defendants, singly or as a group." Eades v. Thompson, 823 F.2d 1055, 1063 (7th Cir. 1987).

Further, it is well established that liability under § 1983 cannot be predicated on the doctrine of respondeat superior.  <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 385 (1989); <u>Monell v. New York City Dep't of Social Serv.</u>, 436 U.S. 658, 691 (1978).

In this case, Plaintiff has failed to show any acts or omissions sufficient to establish deliberate indifference to his medical needs.  Dr. Paderes, in the exercise of his medical judgment rendered that care and treatment that he deemed necessary and appropriate based on his examination of Plaintiff and assessment of his conditions.  He never "purposefully ignore[d] or fail[ed] to respond" to Plaintiff's medical needs.

Plaintiff claims that Dr. Paderes denied him Lamictal until April of 2003.  However, the record is completely devoid of any medical opinion that states that any alleged "denial" of Lamictal caused Plaintiff harm.  In fact, Dr. Ridge agreed that Tegretol was a suitable replacement, Dr. Drazin opined that the treatment of Plaintiff's alleged "seizures" was reasonable and appropriate, and in fact, because he later opined that they were actually pseudoseizures, he believed Plaintiff was actually over-treated pharmaceutically.  (<u>See</u> Dr. Paderes Decl. ¶ 8 and Exh. "A" at HCF00272; and Savage Decl. at Exh. "A").  Dr. Drazin stated that there are **no clear medications that would be appropriate for true pseudoseizures.**"  (<u>See</u> Savage Decl. at Exh. "A").  That is precisely why Dr. Stein recommended **"for**

**seizure management is that he be on no anticonvulsant whatsoever."** (See
Savage Decl. Exh. "C").  He opined that the events are noneptileptic (psychogenic)
in nature.  Id.  Therefore, he stated that if Plaintiff does have anymore of these
events, his head should be cushioned with a pillow and his body otherwise
protected from injury, but other than that, no intervention should be made as they
are semi-voluntary in nature and will cease on their own.  Id.

As further evidence that Plaintiff's seizures were caused by some denial of
Lamictal, Plaintiff suffered from "seizures" even after Lamictal was added to his
medications.  (See Dr. Paderes Decl. at ¶ 13 and Exh. "A" at HCF00837-839).

In addition, there is no evidence that Dr. Paderes was deliberately indifferent
to the treatment of Plaintiff's seizure disorder.  As the medical records show,
Plaintiff's "seizure disorder" was continuously monitored by Dr. Paderes, referrals
to experts, changes in medications, the chronic care clinic, and by way of constant
observation in the infirmary on numerous occasions.

Plaintiff has also failed to establish that Dr. Paderes' treatment of Plaintiff's
knee injury constituted deliberate indifference.  Again, there is absolutely no
medical testimony in the record that Plaintiff should have received knee surgery
prior to March 4, 2004.  In fact, the SURP, consisting of three corrections doctors,
agreed not to rush into knee surgery because:  1) Plaintiff was able to continue with
his daily activities and even work, 2) surgery is not always successful and is often

looked at as a last resort in trying to achieve functionality and relieve pain, 3) there

also can be complications, such as infections, loss of the leg, severe allergic

reactions, and loss of function, and 4) if surgery was done early, the Plaintiff might

have to undergo knee surgery in 10 to 20 years, and due to his advance age he may

not be able to tolerate the same procedure again.  (See Dr. Paderes Decl. at ¶ 23).

Instead, the committee continued Plaintiff on conservative treatment that included

use of a knee brace, physical therapy, and medication.  The evidence also shows

that the SURP monitored and re-evaluated the need for surgery on numerous

occasions.

The Panel ultimately agreed to refer Plaintiff for the surgery when there was

a "new finding of fluid like soft pulp area" to Plaintiff's left knee and because he

was suffering from increased pain and stiffness to the left knee.  (See Paderes Dec.

at ¶ 23 and Exh. "A" at HCF00823).

Based upon the undisputed medical testimony and documentation, Plaintiff

has failed to establish that Dr. Paderes' treatment of Plaintiff for his seizure

disorder or knee injury constituted deliberate indifference.

D.    Dr. Paderes Is Entitled to Qualified Immunity

Qualified immunity protects "all but the plainly incompetent or those who

knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

Government officials who perform discretionary functions have qualified

immunity from liability for civil damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Johnson v. Fankell, 520 U.S. 911, 914-15 (1997) (citation omitted); Gabbert v. Conn, 131 F.3d 793, 799 (9th Cir. 1997) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). This immunity extends to prison officials. Neal v. Shimoda, 131 F.3d 818, 832 (9th Cir. 1987) (citing Procunier v. Navarette, 434 U.S. 555 (1978).

A plaintiff seeking damages for violation of constitutional or statutory rights bears the initial burden of proving that the rights allegedly violated were clearly established at the time of the alleged misconduct. Houghton v. South, 965 F.2d 1532, 1534 (9th Cir. 1992); Davis v. Scherer, 468 U.S. 183, 197 (1984). For the right to be clearly established, its "contours . . . must be sufficiently clear that a reasonable official would understand that what he was doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

The Supreme Court has directed that when defendants seek qualified immunity, Courts should rule on that issue early in the proceedings "so that the costs and expenses of trial are avoided where the defense is dispositive." Saucier v. Katz, 533 U.S. 194, 200 (2001). In Saucier, the Supreme Court also spelled out that in ruling on a qualified immunity defense, the initial inquiry concerns "whether a constitutional right would have been violated on the facts alleged, for if

no right would have been violated, there is no need for further inquiry into immunity. " <u>Saucier,</u> 533 U.S. at 201.

In the instant case, there was no clearly established right to more medical treatment than Plaintiff was in fact given. As set out above, Plaintiff received a tremendous amount of treatment from the HCF medical staff, including Dr. Paderes, and from outside specialists. Dr. Paderes did not "knowingly violate" Plaintiff's constitutional rights. He is, therefore, entitled to qualified immunity.

E. **Even If Otherwise Amenable to Suit Herein, Defendant Dr. Paderes**
   <u>Cannot Be Held Liable for Punitive Damages</u>

Plaintiff's Amended Complaint includes a claim for punitive damages. <u>See</u> Am. Compl. ¶ 31. However, there is no basis for an award of punitive damages against Dr. Paderes, in either his individual or official capacity.

In his official capacities, under the circumstances of this case, Plaintiff's claims for punitive damages against the this State Defendant must be dismissed based on the express terms of HRS § 662-2. That Section provides as follows:

> **§ 662-2 Waiver and liability of State.** The State
> hereby waives its immunity for liability for the
> torts of its employees and shall be liable in the
> same manner and to the same extent as a private
> individual under like circumstances, <u>but shall not</u>
> <u>be liable</u> for interest prior to judgment or <u>for</u>
> <u>punitive damages</u>.

(Emphasis added.)

25

In addition, "Punitive damages may be awarded in cases where the defendant 'has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations'; or where there has been 'some willful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences.'" Kaopuiki v. Kealoha, 104 Hawaii 241, 87 P.3d 910, 925, (Hawaii App. 2003)(citation omitted).  In addition, in order to justify an award of punitive damages, "a positive element of conscious wrongdoing is always required." Masaki v. General Motors Corp., 71 Haw. 1, 7, 780 P.2d 566, 571 (1989)(citations omitted).   Thus, punitive damages are not awarded for mere inadvertence, mistake or errors of judgment. Id.

There are no facts alleged that Dr. Paderes acted wantonly, oppressively or with malice.  Thus, Dr. Paderes has done nothing that would warrant punitive damages being assessed against him individually in this case.

V.    CONCLUSION

Based on the above-stated reasons and authorities, Dr. Paderes respectfully request that the foregoing motion be granted.

DATED: Honolulu, Hawaii, _____April 26_____, 2006.

STATE OF HAWAII

MARK J. BENNETT
Attorney General
State of Hawaii

Christine E. Savage
Deputy Attorney General

Attorney for Defendants