ORIGINAL

MARK J. BENNETT    2672
Attorney General of Hawaii

CHRISTINE E. SAVAGE    7788
CARON M. INAGAKI    3835
Deputy Attorneys General
Department of the Attorney
  General, State of Hawaii
425 Queen Street
Honolulu, Hawaii 96813
Telephone: (808) 586-1494
Facsimile: (808) 586-1369
E-Mail: Christine.E.Savage@hawaii.gov

Attorney for Defendant
DR. SISAR PADERES

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

APR 2 6 2006

at ___ o'clock and ___ min. ___ M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LEROY KEMP,<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>DR. SISAR PADERES, NURSE NEAL HAYASE, NURSE CORRINA HO, ACO SCOTT KOWALESKI, and ACO MELVIN MOISSA,<br>　　　　　Defendants. | CIVIL NO. 03-00419 SOM-KSC<br>DEFENDANT DR. SISAR PADERES' SEPARATE AND CONCISE STATEMENT OF FACTS; EXHIBITS "1" – "2"; CERTIFICATE OF SERVICE<br><br>Hearing<br>Date: _____<br>Time: _____<br>Judge: _____ |

DEFENDANT DR. SISAR PADERES'
SEPARATE AND CONCISE STATEMENT OF FACTS

187516_1.DOC

| FACTS | EVIDENTIARY SUPPORT |
|---|---|
| 1. Dr. Paderes has been employed by PSD as a Physician, Level II, at HCF since 12/96. | Declaration of Dr. Sisar Paderes ¶ 1. |
| 2. Previously he worked at Waimano Training School and Hospital. During the course of that employment from 1985 until 1996, he was taking care of patients that had various seizures, including grand mal seizures because of their brain abnormalities or illnesses. | Id. at ¶ 3. |
| 3. He has attended seminars and reviewed literature distributed by various medical associations concerning treatment of those suffering from seizure disorders. | Id. at ¶ 4. |
| 4. Plaintiff claims to have had "seizures" since 1997. He had head trauma secondary to a fall in 1995, as well as previous head traumas during his younger years. | Declaration of Christine E. Savage at Exh. "A" ¶ 1. |
| 5. On 8/27/01, Plaintiff was transferred from OCCC to HCF. At that time, Plaintiff was taking anti-convulsants, Dilantin and Phenobarbital, for his "seizure disorder." | Dr. Paderes Decl. ¶ 6 and Exh. "A" at HCF00298. |
| 6. On 10/15/01, Plaintiff was admitted to Pali Momi for an "apparent seizure." Dr. Ridge, a neurologist, was consulted regarding Plaintiff's seizure disorder. Based on her exam of the Plaintiff and review of his diagnostic tests, including an EEG, she diagnosed Plaintiff as having pseudoseizures. | Dr. Paderes Decl. ¶ 7 and Exh. "A" at HCF00359-60. |
| 7. Pseudoseizures (psychogenic seizures) are nonepileptic behaviors that resemble seizures. They are often part of a conversion reaction precipitated by underlying psychological distress. | Id. |
| 8. Although Plaintiff thought Phenobarbital controlled his seizures well, Dr. Ridge felt it wasn't a good anti-convulsant, because of its long-term memory loss affects. She recommended the use of Lamictal in its place because of its fewer side affects. | Id. |
| 9. Dr. Paderes received a copy of Dr. Ridge's consultation on 10/22/01, and discussed with her the recommendation to substitute Lamictal. Dr. Paderes informed her that Lamictal was not on HCF's formulary, a list of pre-approved medications for various illnesses and that it would be difficult to obtain. After reviewing his medical reference, Dr. Paderes | Dr. Paderes Decl. ¶ 8 and Exh. "A" at HCF00272. |

| | |
|---|---|
| asked Dr. Ridge if it would be okay to use Tegretal, an anti-convulsant on HCF's formulary, instead of Lamictal. Dr. Ridge agreed that Tegretal would be fine. | |
| 10. On 10/1/01, Plaintiff was admitted to the HCF infirmary for another seizure. During the discharge process on 10/22/02, Dr. Paderes informed Plaintiff of his conversation with Dr. Ridge, and that she said it was okay to substitute the Tegretal for the Lamictal she originally recommended. The Plaintiff said he understood and agreed to the change. | Id. at ¶ 9 and Exh. "A" at HCF00272. |
| 11. Plaintiff saw Dr. Ridge on 1/15/03, for a follow-up to an ER visit for a "seizure." | Dr. Paderes Decl. ¶ 10 and Exh. "A" at HCF00605. |
| 12. On 3/19/03, Dr. Ridge suggested adding Lamictal to medications. Dr. Paderes agreed. | Id. |
| 13. On 3/24/03, Plaintiff was seen in the Chronic Care Clinic, a clinic that is held for patients who have on-going medical conditions that need to be monitored. By then Plaintiff was receiving Phenobarbital (90 mg), Tegretol (300 mg), Lamictal (150 mg) pursuant to Dr. Ridge's March 19, 2003, recommendation. | Id. at ¶ 10 and Exh. "A" at HCF00550-51. |
| 14. On 4/6/03, Plaintiff was admitted to ER for an alleged seizure, and was seen by Dr. Ridge, who recommended a change of medication to Lamictal (200 mg) and Tegretol (500 mg). Plaintiff's medications were changed accordingly. | Dr. Paderes Decl. at ¶ 11 and Exh. "A" at HCF00602. |
| 15. On 5/7/03 and 9/22/03, Dr. Paderes referred Plaintiff to Dr. Ridge for follow up. | Dr. Paderes Decl. at ¶ 12 and Exh. "A" at HCF00588 and 00905. |
| 16. Plaintiff was seen again at the Chronic Care Clinic on 1/4/04 | Id. at ¶ 14 and Exh. "A" at HCF00842-3. |
| 17. Despite the medication changes, Plaintiff was admitted to the HCF infirmary on 4/26/03 – 4/29/03, 7/31/03, 11/8/04 – 1/12/05, 4/18/05 – 4/22/05 and 2/15/06 for "pseudoseizures." | Id. at ¶ 13 and Exh. "A" at HCF00837-839. |
| 18. Plaintiff was also admitted and kept in the infirmary at HCF for constant observation during the following periods: 2/9/02–2/19/02, 3/29/02–3/30/02, 4/1/02–4/2/02, 5/26/02–5/27/02, 6/26/02–6/28/02, 8/27/02, 11/1/02–11/8/02, 12/11/02–12/12/02, and 1/15/03–1/23/03. | Id. at ¶ 15. |

| | |
|---|---|
| 19. Dr. Paderes' did not work at HCF from 7/13/04 until recently due to his deployment to Iraq. | Id. at ¶ 16. |
| 20. Subsequent referrals to specialists confirmed that Plaintiff suffers from pseudoseizures, and any use of anticonvulsants becomes irrelevant. | Id. See also, Savage Decl. Exh.'s "A" – "C" |
| 21. On 9/15/04, Thomas A. Drazin, M.D., a neurologist, performed an IME on Plaintiff. Dr. Drazin concluded that if Plaintiff was suffering from a seizure disorder, the medications prescribed were reasonable and appropriate. In fact, in light of his diagnosis that the Plaintiff was suffering from pseudoseizures, the Plaintiff was actually over-treated, because there are "no clear medications that would be appropriate for true pseudo seizures." | Savage Decl. at Exh. "A". |
| 22. Dr. Drazin reviewed a videotape of one of Plaintiff's "seizures," and concluded that the type of seizures Plaintiff was experiencing were clearly pseudoseizures. | Savage Decl. at Exh. "B". |
| 23. Plaintiff was also referred to Dr. Alan G. Stein, M.D., an epilepsy specialist at the Queen's Medical Center, for video electroencephalogram monitoring to determine whether Plaintiff's seizure-like spells were epileptic or non-epileptic. Plaintiff's medications were tapered and within two days were discontinued altogether. Provocative maneuvers such as sleep deprivation were employed. Plaintiff had a single seizure-like episode on 4/13/05. Behaviorally, this incident was extremely similar to the behavior that was viewed on the videotape. There were no findings to suggest an epileptic seizure basis for the event. In addition, throughout Plaintiff's entire stay, his electroencephalogram was free of any epileptiform activity. | Dr. Paderes Decl. Exh.'s "B" and "C". |
| 24. Dr. Stein's "recommendation for seizure management is that he be on no anticonvulsant whatsoever." He opined that the events are noneptileptic in nature. Therefore, if Plaintiff does have anymore of these events, his head should be cushioned with a pillow and his body otherwise protected from injury, but other than that, no intervention be made as they are semi-voluntary in nature and will cease on their own. | Id. |
| 25. Plaintiff's medical records show that he has a history of knee problems dating back to 1993. | Savage Decl. at Exh. "C" at QMC 027, 057; Dr. |

|  |  |
|---|---|
|  | Paderes Decl. Exh. "A" at HCF00155, 157, 159, 172, 216-9, 237, and 535. |
| 26. 10/11/02, Dr. Paderes referred Plaintiff to Dr. Terry Vernoy, an Orthopedic Surgeon, for a consult. Dr. Vernoy has performed several knee surgeries for HCF inmates. Until recently Plaintiff's main concern was directed toward his "seizures." Plaintiff now claims that he had increased pain and deformity to his left knee due to a seizure. Thus, he felt a consultation was appropriate. | Id. at HCF00535. |
| 27. Dr. Vernoy reported that Plaintiff was seen for what patient states was a deformed left knee since 5/02. He denies any previous knee injury. | Id. at ¶ 19 and Exh. "A" at HCF00606-7. |
| 28. Dr. Vernoy's medical conclusions were: 1) old left knee varus deformity of questionable etiology, most likely secondary to old medial tibial plateau fracture, 2) osteoarthritus of the left knee tricompartments with old anterior cruciate ligament and possible lateral collateral ligament injuries with positive lateral capsular signs, and 3) increased left knee instability per the patient with minimal objective instability on exam. | Id. at ¶ 21 and Exh. "A" at HCF00606-7. |
| 29. Basically, Dr. Vernoy is questioning what Plaintiff is telling him when he refers to questionable etiology. The damage is most likely secondary to "old" fracture. In addition, although Plaintiff reports increasing left knee instability, the objective findings based on his examination, shows "minimal objective instability." In other words, his knee was not as unstable as the patient reported. | Id. at ¶ 22. |
| 30. The other corrections doctors and Paderes, after reviewing Dr. Vernoy's report, decided to continue with conservative treatment that included use of a knee brace, physical therapy, and medications without resorting to surgery. Surgery is often done to restore function and relieve pain. However, in this situation Plaintiff was able to continue with his daily activities and even work. In addition, surgery is not always successful and surgery is often looked at as a last resort in trying to achieve functionality and relieve pain. There are also the complications, such as infections, loss of | Id. at ¶ 23. |



| | |
|---|---|
| the leg, severe allergic reactions, and loss of function. Finally if surgery was done early, the Plaintiff might have to undergo knee surgery in 10 to 20 years. Due to his advance age he may not be able to tolerate the same procedure again. | |
| 31. On 3/24/03, Dr. Paderes requested a re-evaluation of Plaintiff's left knee with Dr. Vernoy. During Plaintiff's follow-up visit on 5/5/03, Dr. Vernoy noted no changes in Plaintiff's repeat X-rays. He recommended that Plaintiff continue with conservative therapy, but if surgery was necessary then he recommended a referral to Dr. Calvin Oishi, an orthopedic surgeon who does knee replacement surgery. | Id. at ¶ 24. |
| 32. In 5/03, the Special Utilization Review Panel ("SURP"), comprised of Dr. Saldana, and Dr. Bauman, and I, discussed whether or not surgery was needed. SURP decided that surgical intervention was not needed at this time, because Plaintiff was ambulatory and functioning independently while on conservative therapy. | Id. at ¶ 25 and Exh. "A" at HCF00585 and 587. |
| 33. In 7/03, SURP again decided not to refer Plaintiff for a surgery consultation due to his ability to work in the work line, weight bear with a brace and, because it was too early in his life for total knee replacement. SURP decided to re-evaluate clinically as needed. | Id. at ¶ 26 and Exh. "A" at HCF00584. |
| 34. In 11/03, Plaintiff claims his knee gave way. On exam, the Plaintiff had facial grimacing, was unable to move his knee, groaning, and appeared to be in severe pain. However, no swelling or bruising was observed. Physical therapy and medication were prescribed, and total knee replacement was denied by SURP. | Id. at ¶ 27. |
| 35. In 12/03, SURP discussed, and decided against, the need for total knee replacement, but to continue conservative treatment. | Id. at ¶ 28 and Exh. "A" at HCF00828 |
| 36. On 1/20/04, Dr. Abbruzzese requested that SURP reassess a new finding of fluid like soft pulp area to Plaintiff's left knee. Plaintiff was also having increased pain and stiffness to the left knee. The next day, SURP discussed his findings, and they agreed to go ahead with the total knee replacement. | Id. at ¶ 29 and Exh. "A: at HCF00823. |
| 37. On 3/4/04, Plaintiff underwent a left total knee replacement. Post-operative discharge diagnosis was severe osteoarthritis of the left knee. | Savage Decl. at Exh. "D" at KMC 201-203 |

187516_1.DOC                                    6