IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LEROY KEMP,<br><br>                Plaintiff,<br>vs.<br><br>DR. SISAR PADERES, NURSE NEAL HAYASE, NURSE CORRINA HO, ACO SCOTT KOWOLESKI, and ACO MELVIN MOISSA,<br><br>                Defendants. | CIVIL NO. 03-00419 SOM-KSC<br><br>DECLARATION OF DR. SISAR PADERES; EXHIBITS "A" – "C" |

## DECLARATION OF DR. SISAR PADERES

SISAR PADERES, M.D., pursuant to 28 U.S.C. § 1746, declares that:

1. I am employed by the Department of Public Safety as a Physician, Level Two, at Halawa Correctional Facility ("HCF") and have been employed in that capacity since December of 1996.

2. I have personal knowledge of the matters set forth herein and I am competent to so testify.

3. Previously I worked for the Department of Health at Waimano Training School and Hospital. During the course of that employment from 1985 until 1996, I was taking care of patients that had various seizures, including grand mal seizures, because of their brain abnormalities or illnesses.

**EXHIBIT "1"**

4.  I have attended seminars and reviewed literature distributed by various medical associations concerning treatment of those suffering from seizure disorders.

5.  I am familiar with Plaintiff Leroy Kemp and, among others, have treated him for his alleged "seizure disorder" and for his left knee injury.

6.  On August 27, 2001, Plaintiff was transferred from Oahu Community Correctional Center to HCF. At that time, Plaintiff was taking the anticonvulsants, Dilantin and Phenobarbital, for his "seizure disorder."

7.  On October 15, 2001, the Plaintiff was sent to, and admitted to, Pali Momi for an "apparent seizure." Dr. Leah Ridge, a neurologist at Pali Momi, was consulted regarding Plaintiff's seizure disorder. Based on her examination of the Plaintiff and review of his diagnostic tests, including an EEG, she diagnosed the Plaintiff as having pseudoseizures. Pseudoseizures (psychogenic seizures) are nonepileptic behaviors that resemble seizures. They are often part of a conversion reaction precipitated by underlying psychological distress.

Although the Plaintiff thought Phenobarbital controlled his seizures well, Dr. Ridge felt it wasn't a good anti-convulsant, because of its long-term memory loss affects. She recommended the use of Lamictal in place of Phenobarbital, because of its fewer side affects. Plaintiff was discharged back to HCF on October 16, 2001.

8. I received a copy of Dr. Ridge's consultation on October 22, 2001, and discussed with her the recommendation to substitute Lamictal for Phenobarbital. I informed Dr. Ridge that Lamictal was not on our formulary, a list of pre-approved medications for various illnesses, and that it would be difficult to obtain. After reviewing my medical reference, I asked Dr. Ridge if it would be okay to use Tegretal, an anti-convulsant on our formulary, instead of Lamictal. She agreed that Tegretal would be fine.

9. On October 1, 2001, Plaintiff was admitted to the HCF Medical Infirmary for another seizure. On October 22, 2001, I discharged the Plaintiff from HCF Medical Infirmary. During the discharge process, I informed Plaintiff of my conversation with Dr. Ridge, and that she said it was okay to substitute the Tegretal for the Lamictal she originally recommended. The Plaintiff said he understood and agreed to the change.

10. Plaintiff was sent to Dr. Ridge on January 15, 2003, for a follow-up to an Emergency room visit for a "seizure." On March 19, 2003, Dr. Ridge suggested adding Lamictal to Plaintiff's medications. I agreed to follow her recommendation. On March 24, 2003, Plaintiff was seen in the Chronic Care Clinic at HCF, a clinic that is held for patients who have on-going medical conditions that need to be monitored. By then, Plaintiff was receiving

Phenobarbital (90 mg), Tegretol (300 mg), Lamictal (150 mg) pursuant to Dr. Ridge's March 19, 2003, recommendation.

11. On April 6, 2003, Plaintiff was admitted to Pali Momi for an alleged seizure, and was seen by Dr. Ridge, who recommended a change of medication to Lamictal (200 mg) and Tegretol (500 mg). As a result, Plaintiff's medications were changed accordingly.

12. On May 7, 2003, and September 22, 2003, I referred Plaintiff to Dr. Ridge for follow-up only. In addition, Plaintiff was seen again at the Chronic Care Clinic on January 4, 2004, for his seizure disorder.

13. Despite the medication changes, Plaintiff was admitted to the HCF infirmary on 4/26/03 – 4/29/03, 7/31/03, 11/8/04 – 1/12/05, 4/18/05 – 4/22/05 and 2/15/06 for "pseudoseizures."

14. In addition to the above-listed dates, Plaintiff was admitted and kept in the infirmary at HCF for constant observation during the following periods: 2/9/02 – 2/19/02, 3/29/02 – 3/30/02, 4/1/02 – 4/2/02, 5/26/02 – 5/27/02, 6/26/02 – 6/28/02, 8/27/02, 11/1/02 – 11/8/02, 12/11/02 – 12/12/02, and 1/15/03 – 1/23/03.

15. I did not work at HCF Medical Unit from On July 13, 2004, until recently due to my deployment to Iraq.

16. However, subsequent referrals to specialists have confirmed that Plaintiff suffers from pseudoseizures, and thus, any use of anticonvulsants, either

Lamictal or Tegretal, becomes irrelevant. Please see Dr. Drazin's report dated September 15, 2004, supplemental report dated September 27, 2004, and Dr. Allan G. Stein's report dated April 15, 2005. Dr. Stein is an epileptologist, a neurologist specially trained to treat epilepsy, and he is the medical Director of the epilepsy monitoring unit at the Queen's Medical Center.

17. Plaintiff has a history of knee problems dating back to at least 1996 due to old injuries.

18. October 11, 2002, I referred Plaintiff to Dr. Terry Vernoy, an Orthopedic Surgeon, for a consult. Dr. Vernoy is a community orthopedic surgeon who has performed several knee surgeries for HCF inmates. Until recently Plaintiff's main concern was directed toward his "seizures." Plaintiff now claims that he had increased pain and deformity to his left knee. Thus, I felt a consultation was appropriate.

19. Dr. Vernoy reported that Plaintiff was seen for what patient states was a deformed left knee since May of 2002 with recent history of seizure on 10/6/02. He stated he was held down during his seizure to prevent him from hurting himself and he experienced increased pain and instability to this left knee. He denies any previous history of knee injury.

20. Recent X-rays of the left knee showed an obvious varus deformity to the left knee joint of questionable etiology, most likely secondary to old fracture of

the medial compartment tibial plateau. There were osteoarthritic changes of the intercondylar notch and patellofemoral area and an old lateral capsular sign consistent with previous anterior cruciate ligament and possible lateral collateral ligament injuries.

21. Dr. Vernoy's medical conclusion after examining the Plaintiff and reviewing his medical records were: 1) old left knee varus deformity of questionable etiology, most likely secondary to old medial tibial plateau fracture, 2) osteoarthritis of the left knee tricompartments with old anterior cruciate ligament and possible lateral collateral ligament injuries with positive lateral capsular signs, and 3) increased left knee instability per the patient with minimal objective instability on exam.

22. Basically, Dr. Vernoy is questioning what Plaintiff is telling him when he refers to "questionable etiology." The damage is most likely secondary to "old" fracture. In addition, although Plaintiff reports increasing left knee instability, the objective findings based on his examination, shows "minimal objective instability." In other words, his knee was not as unstable as the patient reported.

23. The other corrections doctors and myself, after reviewing Dr. Vernoy's report, decided to continue with conservative treatment that included use of a knee brace, physical therapy, and medications without resorting to surgery.

Surgery is often done to restore function and relieve pain. However, in this situation Plaintiff was able to continue with his daily activities and even work. In addition, surgery is not always successful and surgery is often looked at as a last resort in trying to achieve functionality and relieve pain. There are also the complications, such as infections, loss of the leg, severe allergic reactions, and loss of function. Finally if surgery was done early, the Plaintiff might have to undergo knee surgery in 10 to 20 years. Due to his advance age he may not be able to tolerate the same procedure again.

24. On March 24, 2003, I requested a re-evaluation of Plaintiff's left knee with Dr. Vernoy. During Plaintiff's follow-up visit on May 5, 2003, Dr. Vernoy noted no changes in Plaintiff's repeat X-rays. He recommended that Plaintiff continue with conservative therapy, but if surgery was necessary then he recommended a referral to Dr. Calvin Oishi, an orthopedic surgeon who does knee replacement surgery.

25. In May of 2003, the Special Utilization Review Panel ("SURP"), comprised of Dr. Saldana, and Dr. Bauman, and I discussed whether or not surgery was needed. The Panel decided that surgical intervention was not needed at this time, because Plaintiff was ambulatory and functioning independently while on conservative therapy.

26. In July of 2003, SURP again decided not to refer Plaintiff for a surgery consultation due to Plaintiff's ability to work in the work line, weight bear with a brace and, because it was too early in his life for total knee replacement. SURP decided to re-evaluate clinically as needed.

27. In November of 2003, Plaintiff claims he was walking down mainstreet and his knee gave way and he fell on his knee. On exam, the Plaintiff had facial grimacing, was unable to move his knee, groaning, and appeared to be in severe pain. However, no swelling or ecchymosiss (bruising) was observed. Physical therapy and medication were prescribed, and total knee replacement was denied by the SURP committee.

28. In December of 2003, SURP discussed the necessity of a total left knee replacement, and decided against surgical intervention, but to continue conservative treatment.

29. On January 20, 2004, Dr. Abbruzzese requested that SURP reassess a new finding of fluid like soft pulp area to Plaintiff's left knee. Plaintiff was also having increased pain and stiffness to the left knee. The next day, Dr. Abruzzesse discussed his findings with members of the SURP, and we agreed to go ahead with the total knee replacement by Dr. Oishi.

30. On March 4, 2004, Plaintiff underwent a left total knee arthroplasty with lateral release. Post-operative discharge diagnosis was severe osteoarthritis of the left knee.

31. Attached as Exhibit "A" are true and correct copies of excerpts from Plaintiff's HCF medical records.

32. Attached as Exhibit "B" is a true and correct copy of Dr. Alan G. Stein's Admission Report dated April 11, 2005. This report is a part of Plaintiff's HCF medical records, but does not have a Bates Stamp number.

33. Attached as Exhibit "C" is a true and correct copy of Dr. Alan G. Stein's Discharge Report dated April 15, 2005. This report is a part of Plaintiff's HCF medical records, but does not have a Bates Stamp number.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: Honolulu, Hawaii, April 26, 2006.

Dr. Sisar Paderes